UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                  Case No. 23-46912

EXIGENT LANDSCAPING, LLC,                               Chapter 11

                    Debtor.                             Judge Thomas J. Tucker
_____/

**OPINION REGARDING THE UNITED STATES TRUSTEE'S MOTION
TO CONVERT THIS CASE TO CHAPTER 7**

## I. Introduction

This is a Subchapter V Chapter 11 case. The case is before the Court on the motion filed

by the United States Trustee (the "UST"), seeking the conversion of this case to Chapter 7

(Docket # 91, the "Motion"). Two responses to the Motion were filed. The Debtor, Exigent

Landscaping, LLC, and a *pro se* creditor, Jennifer A. Hernandez, each filed an objection to the

Motion.[1] After the UST filed a reply brief in support of the Motion,[2] the Court held a telephonic

hearing, on January 24, 2024.[3] At the conclusion of the hearing, the Court took the Motion under

advisement.[4]

The Court has considered all of the written and oral arguments of the parties, and all of

the papers filed by the parties concerning the Motion, as well as other relevant parts of the record

_____

[1] Docket ## 102, 125.

[2] Docket # 134.

[3] Although she filed a written objection to the Motion, Jennifer Hernandez did not appear at the hearing.

[4] The January 24, 2024 hearing also was a scheduled hearing regarding confirmation of the Debtor's proposed plan, to which objections were filed. For reasons discussed in Part III.B of this Opinion, that confirmation hearing was continued for further hearing, to March 27, 2024.

in this case. For the reasons stated in this Opinion, the Court will grant the Motion and convert this case to Chapter 7.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. LR 83.50(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O), because it is a "matter[] concerning the administration of the estate," and because it is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship."

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans–Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, namely, Bankruptcy Code § 1112(b). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## III. Background

### A. The Debtor and its plan of reorganization

The Debtor filed this Chapter 11 case on August 7, 2023, and elected to proceed under Subchapter V. The Debtor is a Michigan limited liability company, and has described itself this way:

2

> The Debtor was established in 2017, and its primary business is a
> full design [and] build outdoor construction company specializing
> in hardscape construction and pools based in metro Detroit. The
> Debtor does everything from 3D designs, pools, hardscaping,
> landscaping, patios, pergolas, and outdoor kitchens.[5]

On November 6, 2023, the Debtor timely filed a proposed plan of reorganization (the "Plan").[6]  In the Plan the Debtor proposes to continue in business, to pay creditors in part, over a three year period, and to receive a discharge.  Funding for the Plan is projected to come from the Debtor's continuing operations.

The Plan provides for the payment of administrative claims, including fees of the Debtor's counsel, and a small priority claim of the Internal Revenue Service.  The Plan proposes the treatment of 22 classes of secured claims.  Many of those claims are secured by liens in a single vehicle or a single piece of equipment.  A few of those claims are secured by liens in all of the Debtor's assets.

The Plan also proposes to pay a total of $105,000.00, in three annual installments, to the single class of non-priority unsecured claims.  The Debtor's Schedule E/F listed a total of 51 such unsecured creditors, with claims totaling just over $2.2 million.[7]  The Debtor later amended its Schedule E/F, to add another 11 such unsecured creditors, again with the unsecured claims totaling just over $2.2 million.[8]  According to the claims register, 44 proofs of claim have been filed, with secured and unsecured claims totaling over $5.2 million.

---

[5] Br. in Supp. of Debtor's Resp. to [the Motion] (Docket # 125) at pdf pp. 11-12.

[6] Docket # 84.

[7] *See* Schedule E/F (Docket # 30) at pdf pp. 19-28.

[8] *See* Amended Schedule E/F (Docket # 83) at pdf pp. 5-15.

The Plan proposes that the current sole member of the Debtor, Brandon Heitman, retain his interest in the Debtor.

Objections to confirmation of the Debtor's Plan were filed by the UST, the Internal Revenue Service, and an unsecured creditor, Mohamed Saad.[9]  A primary objection argued by both the UST and the creditor Saad is that the Debtor's Plan is not feasible.  Feasibility is required for both a consensual confirmation under 11 U.S.C. § 1191(a) and a non-consensual confirmation under 11 U.S.C. § 1191(b).[10]  The UST and Saad argue that the Debtor has not shown an ability to make the payments that will be required by the Plan.  They point out that the Debtor has not filed any evidence to support the three years of income and expense projections attached to the Plan.  For example, the Debtor has not filed any evidence of its historic (pre-petition) financial performance, including income and expenses.  And, the UST and Saad argue,

---

[9]  Docket ## 109, 116, and 120.

[10]  Confirmation under § 1191(a) requires meeting the requirement under 11 U.S.C. § 1129(a)(11).  Confirmation under § 1191(b) requires meeting the requirements under 11 U.S.C. §§ 1129(a)(11) and 1191(c)(3).  Section 1129(a)(11) requires the Debtor to show that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Section 1191(c)(3) requires the Debtor to show that:

> (A) The debtor will be able to make all payments under the plan; or

> (B) (i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

> (ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

the Debtor's operations have lost money since the Debtor filed this bankruptcy case, a point that is discussed in Part IV.B.1.b of this Opinion, below.

According to the Debtor's ballot summary, two of the 22 secured creditor classes voted to accept the Plan, and the non-priority unsecured creditor class voted to reject the Plan.[11]  The other classes did not vote on the Plan.

**B.  The UST Motion and the Debtor's recent switch to a proposed liquidation sale**

On November 16, 2023, the UST filed its Motion, seeking conversion of this case to Chapter 7.  As noted above, the Court held a hearing on January 24, 2024, regarding both confirmation of the Debtor's proposed Plan and the UST's Motion.

The complexion of this case changed dramatically just before the hearing.  Ninety minutes before the hearing began, the Debtor filed a motion to sell all of its assets, under Bankruptcy Code § 363.  That motion is discussed in more detail in Part IV.B.2 of this Opinion, below.  In filing that motion (the "Sale Motion"),[12] the Debtor abandoned its effort to obtain confirmation of the Plan it had proposed.  The Debtor stated:

> The Debtor has determined, in the exercise of its business judgment, that the best way to maximize the value of its assets is to sell such assets through the Sale pursuant to section 363 of the Bankruptcy Code.  Though Debtor has a pending chapter 11 plan that it believes is confirmable, in light of the objections filed to it, Debtor believes that the most efficient path to a mutually agreeable

---

[11]  *See* Second Am. Report on Tabulation of Votes . . . (Docket # 136) at pdf pp. 2-3.

[12]  The Debtor's Sale Motion is entitled "Debtor's Motion for (A) an Order (I) Establishing Bidding Procedures for the Sale of Substantially All of the Debtor's Assets; (II) Approving Form and Manner of the Sale and Other Notices; and (III) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (B) Order Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, and Encumbrances; and (C) Certain Related Relief" (Docket # 141).

5

resolution would be a section 363 sale, subject to higher and better offers.[13]

Thus, the Debtor has suddenly shifted away from trying to confirm its rehabilitative Plan, and toward holding an all-asset sale that essentially would liquidate the Debtor. Because of this, the Court agreed to the Debtor's request at the hearing to adjourn the confirmation hearing, to March 27, 2024.

In the meantime, the Debtor wants the Court to deny the UST's Motion and let the Debtor's proposed sale process play out. The UST persists in seeking conversion to Chapter 7.

## IV. Discussion

## A. Application of the "cause" standard in § 1112(b) for dismissal or conversion

The UST seeks conversion of this Chapter 11 case based on the "cause" standard in Bankruptcy Code § 1112(b)(1). Subject to certain exceptions discussed later in this Opinion, § 1112(b) requires a court, on the request of a party in interest, to convert a Chapter 11 case to Chapter 7, or dismiss the case, if the court finds "cause" to do so.[14]

---

[13]  Sale Mot. (Docket # 141) at pdf pp. 10-11, ¶ 24.

[14]  Section 1112(b) states, in relevant part:

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.
> . . . .
>
> (4) For purposes of this subsection, the term "cause" includes--
>
>> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

6

> In determining whether cause exists to dismiss [or convert] a case under § 1112(b), a court must engage in a "case-specific" factual inquiry which "focus[es] on the circumstances of each debtor." *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.* (*In re Timbers of Inwood Forest Assocs., Ltd.*), 808 F.2d 363, 371–72 (5th Cir.1987) (en banc), *aff'd*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr.W.D.Tenn.1992). The party seeking dismissal [or conversion] carries the burden of proof and must satisfy that burden by a preponderance of the evidence. *See Loop Corp. v. U.S. Tr.* (*In re Loop Corp.*), 379 F.3d 511, 517–18 (8th Cir.2004) (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.1994)). A "bankruptcy court has broad discretion to dismiss [or convert] a Chapter 11 case under 11 U.S.C. § 1112(b)." *AMC Mortg. Co. v. Tenn. Dep't of Revenue* (*In re AMC Mortg. Co.*), 213 F.3d 917, 920 (6th Cir.2000). "Accordingly, the decision to dismiss [or convert] the case will be upheld unless it was an abuse of discretion, defined as 'a definite and clear conviction that the trial court committed a clear error of judgment.'" *Id.* (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir.1996)).

*In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013);[15] *see also In re Basrah Custom Design, Inc.* 600 B.R. 368, 377-78 (Bankr. E.D. Mich. 2019) (same) (quoting *Creekside*, 489 B.R. at 60, and also citing *In re Skymark Properties II, LLC*, 597 B.R. 391, 395-96 (Bankr. E.D. Mich. 2019)).

---

> rehabilitation;
>
> (B) gross mismanagement of the estate;
> . . .
>
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

11 U.S.C. § 1112(b).

[15] *Creekside Apartments* involved a dismissal rather than a conversion, but that case's discussion of the "cause" standard of 11 U.S.C. § 1112(b) also applies to conversion.

7

"Section 1112(b)(4) contains a nonexhaustive list of examples of 'cause' justifying dismissal [or conversion] of a Chapter 11 case." *Creekside,* 489 B.R. at 60. The list includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" (*see* 11 U.S.C. § 1112 (b)(4)(A)); "gross mismanagement of the estate" (*see* 11 U.S.C. § 1112 (b)(4)(B)); and "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter" (*see* 11 U.S.C. § 1112 (b)(4)(F)). "'"[O]ne ground for cause is sufficient standing alone'" to justify the 'for cause' dismissal [or conversion] of a Chapter 11 case. *Reagan v. Wetzel* (*In re Reagan*), 403 B.R. 614, 621 (8th Cir. BAP 2009) (quoting *Loop Corp. v. U.S. Trustee*, 290 B.R. 108, 112 (D.Minn. 2003))." *Creekside*, 489 B.R. at 60; *see also California Palms Addiction Recovery Campus, Inc. v. Vara* (*In re California Palms Addiction Recovery Campus, Inc.*), 87 F.4th 734, 740 (6th Cir. 2023) (explaining that the court "need[ed] only to agree with one of [the four] causes [the bankruptcy court found to convert the case] to affirm").

"The court . . . has discretion in determining what additional circumstances not enumerated in section 1112(b)(4) constitute cause." 7 Collier on Bankruptcy ¶ 1112.01 [2] (Richard Levin & Henry J. Sommer eds., 16th ed., 2023). And "[i]n addition to the enumerated causes in section 1112(b), section 1112(e) provides that the court may convert the case to chapter 7 or dismiss the case upon motion by the United States trustee if the debtor fails to file the information required by the first paragraph of section 521(a)." *Id.* at ¶ 1112.01 [5] (footnote omitted). Among the items section 521(a) requires the Debtor to file is a Statement of Financial Affairs. *See* 11 U.S.C. § 521(a)(1)(B)(iii).

8

The UST seeks conversion of the case to Chapter 7 based on §§ 1112(b)(4)(A) and 1112(b)(4)(B). And based on the UST's arguments under those subsections, the Court also finds it relevant to discuss § 1112(b)(4)(F).

**1. 11 U.S.C. § 1112(b)(4)(A)**

**a. The standard**

"Cause" under 11 U.S.C. § 1112(b)(4)(A) requires a showing that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." In *Creekside*, the court discussed what constitutes "cause" within the meaning of this section:

> In order to demonstrate that cause exists to dismiss a case pursuant to § 1112(b)(4)(A), "the moving party must demonstrate that there is both (1) a [substantial or] continuing loss to or diminution of estate assets and (2) an absence of a reasonable likelihood of rehabilitation.'' *In re Westgate Props., Ltd.*, 432 B.R. 720, 723 (Bankr.N.D.Ohio 2010). To satisfy the first prong, a movant may demonstrate "that the debtor continues to incur losses or maintains a negative cash-flow position after the entry of the order for relief" or that the debtor's assets have declined in value since the case was commenced. *Id.* (citation omitted); 3685 *San Fernando Lender, LLC v. Cross Equities, LLC* (*In re USA Commercial Mortg., Co.*), 452 Fed. Appx. 715, 724 (9th Cir.2011); *In re Wahlie,* 417 B.R. 8, 11 (Bankr.N.D.Ohio 2009); *see also* 7 *Collier on Bankruptcy* ¶ 1112.04[6][a] (16th ed. 2012). The loss may be substantial or continuing. It need not be both in order to constitute cause under §1112(b)(4)(A). 7 *Collier on Bankruptcy*, ¶ 1112.04[6][a][i] (16th ed. 2012) ("By the use of the word 'substantial' in section 1112(b)(4)(A), Congress has indicated that a loss need not be continuing in order to satisfy the first prong of this enumerated cause.").
>
> To satisfy the second prong of § 1112(b)(4)(A), a movant must demonstrate that the debtor does not have a reasonable likelihood of rehabilitation. As used in § 1112(b)(4)(A), "rehabilitation does not necessarily denote reorganization, which

9

could involve liquidation. Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *Westgate Props.*, 432 B.R. at 723 (quoting *In re V Cos.*, 274 B.R. 721, 725 (Bankr.N.D.Ohio 2002)). "'Rehabilitation' is a different and ... much more demanding standard than 'reorganization.'" *In re Brutsche*, 476 B.R. 298, 301 (Bankr.D.N.M.2012). If "'the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time,'" then the debtor may have a reasonable likelihood of rehabilitation. *In re Costa Bonita Beach Resort, Inc.*, 479 B.R. 14, 42 (Bankr.D.P.R.2012) (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[6][a] (16th ed. 2012)). "The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" *Loop Corp.*, 379 F.3d at 516 (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995)).

*Creekside*, 489 B.R. at 61.

### b. Application of the standard

The UST argues that § 1112(b)(4)(A) applies. The UST argues that since filing this bankruptcy case, the Debtor has operated at a substantial and continuing loss, and has suffered a diminution of the estate. The UST also argues that the Debtor does not have a reasonable likelihood of rehabilitation.

### i. Substantial or continuing loss to or diminution of the estate

As for loss and diminution of the estate, the UST points mainly to the Debtor's monthly operating reports. Those reports show that the Debtor has had a substantially negative net operating loss since filing this bankruptcy case on August 7, 2023. The monthly operating reports show post-petition net income and net losses from operations as follows:

10

- August 2023: negative $66,296.72[16]
  (August 7-31, 2023)

- September 2023: negative $6,556.33[17]

- October 2023: negative $3,908.65[18]

- November 2023: positive $14,475.62[19]

- December 2023: negative $16,165.60[20]

**Total/net to date: negative $78,451.68**

In addition to these operating losses, the UST correctly notes that the Debtor's cash on

hand and accounts receivable both have declined substantially since the petition date. And there

is no contention or evidence that the Debtor has used its cash or accounts receivable proceeds to

---

[16] This number is derived from the Debtor's Profit and Loss Statement for the period August 7-31, 2023, which was filed as part of the Debtor's third amended monthly operating report for this period (Docket # 135). This Profit and Loss statement shows a positive "net income" of $29,521.72. (Docket # 135 at pdf p. 6). But the Debtor's listed income for this period includes $95,818.44 that the Debtor received shortly after filing bankruptcy from a pre-petition sale of equipment. (*See id.* at pdf p. 5). (During the hearing the Debtor's counsel stated that this was a sale by the Debtor of a truck and a trailer, for which the Debtor received a check on August 4, 2023, which check cleared on the August 7, 2023 petition date). This was income from a partial liquidation of assets, which clearly was not in the ordinary course of the Debtor's business. It was not income from the Debtor's operations. As a result, the Court has backed this income out for purposes of determining the Debtor's net income/loss from the operations of the Debtor's business. The result is a net loss for the August 7-31, 2023 period — *i.e.*, a negative $66,296.72.

[17] This is shown by the Debtor's monthly operating report for September 2023 (Docket # 81), at pdf pp. 3, 7, and the Debtor has admitted this in its response to the UST's motion (Docket # 125) at pdf p. 11.

[18] This is shown by the Debtor's monthly operating report for October 2023 (Docket # 93), at pdf pp. 3, 7, and the Debtor has admitted this in its response to the UST's motion (Docket # 125) at pdf p. 11.

[19] This is shown by the Debtor's monthly operating report for November 2023 (Docket # 118), at pdf pp. 3, 6, and the Debtor has admitted this in its response to the UST's motion (Docket # 125) at pdf p. 11.

[20] This is shown by the Debtor's monthly operating report for December 2023 (Docket # 145), at pdf pp. 3, 5. That monthly operating report was due to be filed no later than Monday, January 22, 2023, but the Debtor filed it late (and after the January 24, 2024 hearing), on January 25, 2024.

acquire other assets. The Debtor's monthly operating reports and Schedule A/B show the following amounts of the Debtor's total cash on hand and accounts receivable as of the following dates:

| Date | Cash | Accounts Receivable |
|------|------|---------------------|
| • August 7, 2023 (petition date) | $80,136.72[21] | $185,000.00[22] |
| • August 31, 2023 | $20,718.33 | $74,781.00[23] |
| • September 30, 2023 | $12,775.93 | $60,900.97[24] |
| • October 31, 2023 | $8,869.54 | $49,020.70[25] |
| • November 30, 2023 | $24,599.67 | $30,232.62[26] |
| • December 31, 2023 | $7,806.02 | $50,123.62[27] |
| **Net decline since petition date:** | **-$72,330.70** | **-$134,876.38** |

---

[21] *See* the Debtor's third amended monthly operating report for August 2023 (Docket # 135) at pdf p. 2.

[22] *See* Schedule A/B, item 11 (Docket # 30 at pdf p. 3).

[23] The source for the August numbers on this line is the Debtor's third amended monthly operating report for August 2023 (Docket # 135), at pdf pp. 2, 3.

[24] The source for the September numbers on this line is the Debtor's monthly operating report for September 2023 (Docket # 81), at pdf pp. 2, 3, 5.

[25] The source for the October numbers on this line is the Debtor's monthly operating report for October 2023 (Docket # 93), at pdf pp. 2, 3, 5.

[26] The source for the November numbers on this line is the Debtor's monthly operating report for November 2023 (Docket # 118), at pdf pp. 2, 3, 7.

[27] The source for the December numbers on this line is the Debtor's monthly operating report for December 2023 (Docket # 145), at pdf pp. 2, 3, 6.

12

The Debtor argues that its business is seasonal in nature, mainly because much of its business is selling and installing swimming pools. The Debtor's attorney argued during the hearing that the months of November through February are the Debtor's slow time, and that most of the Debtor's income comes during the months of March through October. During the hearing, the Debtor's attorney asserted that in 2022, for example, approximately 89% of the Debtor's income was earned during the months of March through October. But the Debtor's attorney admitted that there is no evidence or documentation to support that assertion in the record. Indeed, in this case, the Debtor has never filed, either with its Plan or in opposing the UST's Motion, or otherwise, any evidence of the Debtor's historical, pre-petition financial performance.

Even if the Court assumes that the Debtor's business historically has been seasonal, as the Debtor asserts without evidence, that does not adequately respond to the evidence cited above, showing the Debtor's dismal financial performance since filing this bankruptcy case. And that evidence shows that during each of the months of August, September, and October 2023, during part of what the Debtor says is its busy season, the Debtor actually suffered substantial net losses, totaling $76,761.70, and the Debtor suffered a large reduction in the amount of the Debtor's cash on hand (a decline totaling $71,267.18 from August 7, 2023 to October 31, 2023) and accounts receivable (a decline totaling $135,979.30 from August 7, 2023 to October 31, 2023). And the Debtor has not adequately contested the following statements by the UST, made in its Motion and in its reply brief, and reiterated during the hearing:

> The cornerstone of the Debtor's cash collateral budget [Docket #6, Exhibit 2] is that the Debtor would be able to sell a pool to a new customer every month for the months August, September, and

October.  **The Debtor has not sold a new pool since the case was filed.**
. . .

The Debtor's income has been based on "change orders" - updates or additions to current projects with current customers. **The Debtor does not have any new pool clients** . . . .[28]

The Debtor needs a steady supply of new pool clients to sustain its business (Docket #6, page 26).  **But the Debtor does not have any new pool clients.**  Its income has come exclusively from updates or additions to current projects with current customers.[29]

The Debtor has not disputed that it has failed to sell any new pools since filing this case on August 7, 2023.

For all of the above reasons, the Court finds that there has been both a "substantial" and a "continuing" loss to and diminution of the bankruptcy estate in this case, within the meaning of § 1112(b)(4)(A).

### ii. Absence of a reasonable likelihood of rehabilitation

The Court also finds that there is an "absence of a reasonable likelihood of rehabilitation," within the meaning of § 1112(b)(4)(A).  This is clear from the facts and reasons stated above.  It is also clear from the fact that the Debtor has effectively abandoned any effort to obtain confirmation of its Plan.  That Plan was rehabilitative in nature, in that it proposed that the Debtor restructure its debt and continue in business.  But now the Debtor no longer seeks such rehabilitation.  Rather, the Debtor now seeks, in effect, liquidation, by selling all of the Debtor's assets in a § 363 sale.

---

[28] Mot. (Docket # 91) at pdf pp. 8-9, ¶¶ 40-41 (emphasis added).

[29] UST Reply [etc.] (Docket # 134) at pdf p. 3, ¶ 11 (emphasis added).

14

For the reasons stated above, the Court finds that there is "cause" to convert or dismiss this case under 11 U.S.C. §§ 1112(b)(1) and 1112(b)(4)(A).

## 2. 11 U.S.C. § 1112(b)(4)(B)

### a. The standard

What constitutes "gross mismanagement of the estate" for purposes of 11 U.S.C. § 1112(b)(4)(b) was discussed by the court in *In re Ozcelebi*, 639 B.R. 365, 388-89 (Bankr. S.D. Tex. 2022) (footnotes omitted):

> Section 1112(b)(4)(B) provides that gross mismanagement of the estate is cause for dismissal or conversion. Analysis under § 1112(b)(4)(B) focuses solely on the management of the estate and does not include mismanagement of the pre-petition debtor. Therefore, the Court considers only the post-petition conduct of Debtor as debtor-in-possession.
>
> A debtor-in-possession is vested with significant power under the Bankruptcy Code and that power comes with certain responsibilities. A debtor-in-possession owes a fiduciary duty to its creditors. Gross mismanagement of the estate is a breach of that duty. And while "gross mismanagement" is not defined by the Bankruptcy Code, Black's Law Dictionary defines "gross" as "beyond all reasonable measure; flagrant." Given the plain language, a debtor's mismanagement must be beyond all reasonable measure. . . .
>
> A variety of conduct can establish gross mismanagement. In [*In re*] *Visicon* [*Shareholders Trust*, 478 B.R. 292 (Bankr. S.D. Ohio 2012)], the court found that the debtor grossly mismanaged the estate because the debtor used the estate's cash to pay the personal expenses of insiders and pre-petition unsecured creditors, and to make costly renovations to the debtor's business. In [*In re*] *210 West Liberty* [*Holdings, LLC*, No. 08-677, 2009 WL 1522047, 2009 Bankr. LEXIS 1706 (Bankr. N.D. W. Va. May 29, 2009)], the court found that the debtor engaged in gross mismanagement because the debtor made no attempt to collect a rent obligation owing to it and provided no compelling reason why the debtor was not pursuing the estate asset; received money from third parties to

15

> pay the debtor's expenses without timely disclosure to the court
> and parties in interest or without seeking approval of the court for
> engaging in some form of post-petition financing, if the money
> received was indeed a loan rather than a gift; and failed to remedy
> fire code violations that threatened the loss of the debtor's
> occupancy permit.  In *In re Wallace*, No. 09-20496-TLM, 2010
> WL 378351, at *4–5, 2010 Bankr. LEXIS 261, at *16–19 (Bankr.
> D. Idaho Jan. 26, 2010), the court found that the debtors
> compensated professionals out of the debtor-in-possession's
> account without first seeking court approval, obtained post-petition
> financing without court approval, and paid pre-petition credit card
> debt.  Those actions, in conjunction with the debtors' inadequate
> financial report and conduct falling under § 1112(b)(4)(A),
> constituted gross mismanagement of the estate.  In *In re Fall*, 405
> B.R. 863, 869 (Bankr. N.D. Ohio 2009), the court found that the
> debtor grossly mismanaged the estate where the debtor used cash
> collateral without court authority, failed to maximize estate assets,
> in part by failing to pursue its accounts receivable, and failed to
> provide the court with an accurate financial picture of the
> debtor-in-possession.

*Id.*; *see also In re Stream TV Networks, Inc.*, No. BR 23-10763 (MDC), 2024 WL 87639, at *15

(Bankr. E.D. Pa. Jan. 5, 2024).  Although "[s]imple **mismanagement** is insufficient for a finding

of gross mismanagement of the estate[, s]imple **misconduct** can collectively demonstrate gross

mismanagement of the estate."  *In re M.A.R. Designs & Constr., Inc.,* 653 B.R. 843, 857 (Bankr.

S.D. Tex. 2023) (footnotes omitted) (emphasis added).

### b.  Application of the standard

The UST argues that the Debtor is guilty of gross mismanagement of the estate, for a

variety of reasons.  The Debtor vigorously contests the UST's charge of gross mismanagement.

Under the circumstances, the Court finds it unnecessary to decide whether the Debtor is

guilty of gross mismanagement.  This is so because other grounds clearly exist for converting this

case to Chapter 7, as described in this Opinion.

16

### 3. 11 U.S.C. § 1112(b)(4)(F)

Under 11 U.S.C. § 1112(b)(4)(F), "cause" exists to convert or dismiss a case where there is an "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter."

Without explicitly arguing that this section applies, the UST's arguments implicitly invoke this section. As the prime example of this, and as the UST points out, it is undisputed that the Debtor failed to timely file a complete and accurate Statement of Financial Affairs (the "SOFA"). Although the Debtor did file a SOFA by the August 21, 2023 deadline to do so,[30] the UST argues that the SOFA filed on that date was grossly inaccurate and incomplete. If that is so, it may mean that the Debtor failed to satisfy its filing/reporting requirement to file a SOFA, within the meaning of 11 U.S.C. § 1112(b)(4)(F).

> [T]he Debtor's failure to provide accurate schedules and statements falls under § 1112(b)(4)(F) as an unexcused failure to satisfy timely any filing or reporting requirement. Simply filing the correct form on time is not compliance with § 1112(b)(4)(F), at least where the timely filed documents contain grossly erroneous, material information. "Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is . . . relevant [under § 1112(b)(4)(F) ]." *In re Tucker*, 411 B.R. 530, 532 (Bankr.S.D.Ga. 2009); *see also In re Charles Street African Methodist Episcopal Church of Boston*, 499 B.R. 66, 115–16 (Bankr.D.Mass.2013); *In re Hoyle*, [No. 10–01484–TLM,] 2013 WL 210254, at *6–7 (Bankr.D.Idaho Jan. 17, 2013); *In re Whetten*, 473 B.R. 380, 383 (Bankr.D.Colo.2012); *In re Sanders*, [No. 09–09094–dd,] 2010 WL 5136192, at *4 (Bankr.D.S.C. Apr. 29, 2010).

*In re Korn*, 523 B.R. 453, 467 n.32 (Bankr. E.D. Pa. 2014); *see also In re Visicon S'holders Tr.*, 478 B.R. 292, 311, 315 (Bankr. S.D. Ohio 2012) (explaining that "full, complete and candid

---

[30] Docket # 30.

disclosure of all financial information concerning the Chapter 11 debtor in possession is compulsory" and dismissing the debtor's bankruptcy case for "cause" under 11 U.S.C. § 1112(b)(4)(F), where "the monthly operating reports were proven both inaccurate and incomplete" and the debtor had no good excuse for the deficiencies in the reports and there were no unusual circumstances in the case).

The Court finds that the Debtor's originally-filed SOFA was substantially inaccurate and incomplete, particularly with respect to the Debtor's answer to Question 13 in Part 6 of the SOFA. Question 13 required the Debtor to provide the following information about pre-petition transfers of property:

> **13.     Transfers not already listed on this statement**
>
> > List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on the statement.[31]

And Question 13 required the Debtor to disclose all of the following, for each transfer:

- Who received [the] transfer?

- Address [of the transferee]

- Description of property transferred or payments received or debts paid in exchange

- Date transfer was made

---

[31] Statement of Financial Affairs (Docket # 30) (the "Original SOFA") at pdf p. 42 (bold in original).

- Total amount or value [of the transfer][32]

It now turns out that in its Original SOFA, filed August 21, 2023, the Debtor failed to disclose its pre-petition sales of at least 11 pieces of equipment, the value of which the Debtor now says totals $161,000.00. The Debtor did not rectify these significant errors in its Original SOFA until the Debtor filed its amended SOFA on January 3, 2024, more than four months after the Original SOFA was filed.[33]

The Debtor stated as its excuse for failing to list so many transfers in its Original SOFA that "[t]he Debtor did not have its 2022 Tax Returns filed at the time of filing the bankruptcy case. The Debtor discovered that more equipment was transferred during the preparation of the 2022 Tax Return."[34]

This stated excuse is really no excuse at all. It raises some obvious questions, which the Debtor has not satisfactorily answered. The Debtor is owned, managed, and operated by its sole member and President, Brandon Heitman. Obvious questions include: how could the Debtor's manager and sole member not know about these 11 undisclosed transfers, totaling $161,000.00, until he first saw the Debtor's 2022 Tax Returns, sometime after the Original SOFA was filed on August 21, 2023? If Mr. Heitman really did not know of these many transfers, why not? What does that indicate about the quality of the Debtor's management?

---

[32] *Id.*

[33] *Compare* Original SOFA (Docket # 30) at pdf p. 42 *with* Amended Statement of Financial Affairs (Docket # 124) (the "Amended SOFA") at pdf pp. 7-9 (additional transfers listed at item nos. 13.6 through 13.16).

[34] Debtor's Resp. to the UST's Mot. to Convert Case (Docket # 125) at pdf p. 22.

19

And in any event, of course, the Debtor, through its management, had a duty to review its records and investigate its pre-petition transfers, at least to the extent necessary to timely, fully, and accurately disclose them as required in the Original SOFA.

Even the Debtor's Amended SOFA is seriously deficient on its face. It lists the transferee for three of the transfers disclosed, which total $67,000.00, as "Unknown," and gives no address for those transferees.[35] And it gives only the year as the date for nine of the transfers, and gives no date at all for one of the transfers.[36]

For the five transfers that the Debtor did list in its Original SOFA, the Debtor failed to disclose important required information. For the Debtor's sale of a "247B Compact Track Loader," sold for $24,000.00 on the stated date of "10/2022," the Debtor listed the Transferee as "Unknown," and listed no address for the transferee.[37] The Debtor's Amended SOFA changed the amount of this transfer to $22,000.00, but still failed to state the name or address of the "Unknown" transferee.[38]

Another deficiency in the Debtor's Original SOFA concerns the transfer on the stated date of "1/2023" to "Classic Pools" of "Misc. Construction Equipment" for a value of "Unknown."[39] This information about the transfer to Classic Pools is inadequate and incomplete; it is essentially useless. And it turns out that the value of this transfer was significant — the

---

[35] Amended SOFA at pdf pp. 7-9, item nos. 13.4, 13.10, and 13.15.

[36] *Id.*, item nos. 13.6 -13.15.

[37] Original SOFA at pdf p. 42, item no. 13.4.

[38] Amended SOFA at pdf p. 7, item no. 13.4.

[39] Original SOFA at pdf p. 42, item no. 13.5.

Debtor's Amended SOFA later listed the previously "Unknown" value of this transfer as $80,000.00.[40]

This additional transfer value of $80,000.00, plus the $161,000.00 value of the 11 transfers not disclosed in the Debtor's Original SOFA, means that there is a total of ***$241,000.00*** in value in pre-petition transfers that the Debtor failed to disclose in its original SOFA.

"[T]here are circumstances under which scheduling an asset's value as 'unknown' is appropriate; however, doing so when a debtor has access to information from which either an exact or approximate valuation is ascertainable is not 'reasonable under the circumstances.'" *In re Ozcelebi*, 639 B.R. 365, 402-03 (Bankr. S.D. Tex. 2022) (footnote omitted). Here, where the Debtor is owned, managed, and operated by its sole member and President, Brandon Heitman, it is not reasonable for Mr. Heitman, who executed and verified the Debtor's Original SOFA and Amended SOFA, and other required bankruptcy filings, not to know or have access to the prices for which the Debtor's assets sold, and not to know or have access to information about who purchased such assets from the Debtor and when.

Given all of the omissions in the Debtor's Original SOFA, the Court finds that such document was so seriously deficient that it did not satisfy the Debtor's filing/reporting obligation. This unexcused failure demonstrates "cause" to convert or dismiss this case, under 11 U.S.C. § 1112(b)(4)(F).

In sum, the Court finds and concludes that there is "cause" to dismiss or convert this case, based on 11 U.S.C. §§ 1112(b)(1), 1112(b)(4)(A), and 1112(b)(4)(F).

---

[40] Amended SOFA at pdf p. 7, item no. 13.5.

**B. The Court will convert this case to Chapter 7, because conversion, rather than dismissal, is in the best interests of creditors and the estate.**

**1. The choice is between dismissal and conversion.**

Having found that cause exists to dismiss or convert this case under § 1112(b)(1), the

Court must either dismiss or convert, unless one of three statutory exceptions applies. None of

the exceptions apply, so the Court must either dismiss or convert.

The statutory exceptions are contained in §§ 1112(b)(1), 1112(b)(2), and 1112(c). The

first two of those sections state:

> (1) **Except as provided in paragraph (2) and subsection (c)**, on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause **unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.**

> (2) **The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if** the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtors or any other party in interest establishes that—

>> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

>> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

>>> (i) for which there exists a reasonable justification for the act or omission; and

> > (ii) that will be cured within a reasonable period of
> > time fixed by the court.

11 U.S.C. §§ 1112(b)(1), 1112(b)(2) (emphasis added).

These exceptions to making the conversion-or-dismissal choice do not apply. First, the exception under § 1112(c) does not apply. That section states:

> > (c) The court may not convert a case under this chapter to a case
> > under chapter 7 of this title if the debtor is a farmer or a
> > corporation that is not a moneyed, business, or commercial
> > corporation, unless the debtor requests such conversion.

In this case, the Debtor is not "a farmer" or "a corporation that is not a moneyed, business, or commercial corporation."

Second, the exception in § 1112(b)(1) does not apply. No one has argued that it is in the best interests of the creditors and the estate to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a), or to appoint an examiner. The Court finds that neither of these choices is in the best interests of the creditors and the estate. This is so because neither of these options would serve any useful purpose in this case, and also for the same reasons why conversion, rather than dismissal, is in the best interests of the creditors and the estate, as discussed below.

Third, the exception in § 1112(b)(2) does not apply, for at least three reasons: because (1) there are no "unusual circumstances establishing that converting or dismissing this case is not in the best interests of creditors and the estate[;]"[41] (2) there is not a "reasonable likelihood that a plan will be confirmed" in this case; and (3) none of the "cause" grounds for converting or dismissing in this case are a type described by § 1112(b)(2)(B). Each of these reasons is alone sufficient to make § 1112(b)(2) inapplicable.

---

[41] This conclusion is bolstered by the discussion in the next part of this Opinion.

**2. Conversion, rather than dismissal, is in the best interests of creditors and the estate.**

In this case, therefore, the choice under § 1112(b)(1) is between dismissal and conversion. The Court must determine which of these two choices is "in the best interests of creditors and the estate." *See also California Palms*, 87 F.4th at 741. In making this choice, "[t]here is no bright line test to determine whether conversion or dismissal is in the best interest of creditors and the estate. The decision is left to the Court's discretion." *In re Ozcelebi,* 639 B.R. at 425 (footnote omitted).

> [C]reditors are generally "best served by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time." The best interest of the estate turns on whether its economic value "is greater in or out of bankruptcy."

*In re Aurora Memory Care, LLC*, 589 B.R. 631, 643 (Bankr. N.D. Ill. 2018) (citations omitted).

The Court finds that conversion to Chapter 7, rather than dismissal, is in the best interests of creditors and the estate, for the following reasons.

First, as evidenced by the UST's Motion and by the Debtor's § 363 Sale Motion, the UST and the Debtor now share the view that the Debtor should be liquidated *in bankruptcy*. The question about which they disagree, in substance, is who should conduct the liquidation — the Debtor or a Chapter 7 trustee. It appears that neither the UST nor the Debtor want the Court to dismiss this case. The Debtor has not argued that dismissal is better than conversion; rather, the Debtor simply opposes conversion, and wants to conduct the liquidation itself, through a § 363 sale process.

24

Second, it is best for creditors and the estate that a neutral Chapter 7 trustee, rather than the Debtor, conduct the liquidation of the Debtor. As the Debtor argues, it is true that conversion to Chapter 7 will result in the added administrative expenses of the Chapter 7 trustee and his/her counsel. But in the Court's view that consideration is far outweighed by the benefits of having a neutral Chapter 7 trustee conduct the liquidation of the Debtor. This is particularly true in this case, because by filing its § 363 Sale Motion, the Debtor has placed its controlling management in a striking conflict of interest.

The Debtor's Sale Motion proposes to sell the Debtor's assets to Amanda Pisarski, who is *the wife of the Debtor's 100% member*, Brandon Heitman.[42] As proposed, the sale would be subject to higher and better offers, through a "marketing and auction process," according to certain proposed bidding procedures that will apply if there are any competing bidders.[43] The Debtor proposes "to market and solicit offers for the Assets."[44]

The Debtor's sole manager and owner, Mr. Heitman, obviously has a significant conflict of interest. Under the Sale Motion, Mr. Heitman would be tasked with causing the Debtor to seek bidders to compete with his own wife, and to outbid his wife's bid. The Court and the creditors reasonably may question whether the Debtor will make much effort to obtain other bidders and higher bids, let alone make a vigorous effort. The Debtor and its management have a fiduciary duty to the bankruptcy estate and its creditors, and the Court cannot permit the Debtor to be compromised, or even appear to be compromised, by this clear conflict of interest.

---

[42] *See, e.g.*, Sale Motion (Docket # 141) at pdf p. 8, ¶ 9.

[43] *See id.* at pdf p. 11, ¶ 26.

[44] *Id.* at pdf p. 12, ¶ 27.

The Court's concern about this conflict is only enhanced by the terms of the Debtor's proposed sale to this insider.[45]  The terms of the proposed sale to Ms. Pisarski, which are set out in the Asset Purchase Agreement (the "APA") attached to the Sale Motion,[46] appear to greatly favor Ms. Pisarski, to the detriment of the Debtor.

First and foremost, the purchase price for the Debtor's assets appears to be extremely low. The price is $35,000.00, plus the assumption of three loans that are secured by a pickup truck and two Caterillar excavators.[47]  That purchase price is in exchange for the Debtor's sale of all of its personal property (*i.e.*, all of the Debtor's assets), other than "avoidance actions and cash or cash equivalents," but ***including*** the Debtor's accounts receivable.[48]  The Debtor's accounts receivable alone totaled $30,232.62 as of the end of November, according to the Debtor's November monthly operating report.  That was the latest information publicly available as of the time of the January 24, 2024 hearing.  The day after that hearing, the Debtor filed its untimely monthly operating report for December, and that showed that the Debtor's accounts receivable totaled $50,123.62 as of December 31, 2023.[49]  The assets to be sold, essentially for $35,000.00, in addition to these accounts receivable, include three trucks, two "vacuum paver lifters," three trailers, two Caterpillar excavators, three Caterpillar track loaders, office furniture and office equipment, and many other items.

---

[45] The proposed purchaser, Ms. Pisarski, is an "insider" of the Debtor, under the Bankruptcy Code's definition of "insider."  *See* 11 U.S.C. § 101(31)(B)(vi).

[46] APA (Docket # 141, Ex. 2) at pdf p. 58-69.

[47] *Id.* at §§ 2, 15(k) (Docket # 141 at pdf pp. 58, 67).

[48] *Id.* at §§ 1, Ex. A (Docket # 141 at pdf pp. 58, 70-72).

[49] *See* Part IV.A.1.b.i of this Opinion for the Debtor's accounts receivable numbers.

Thus, the proposed purchase price of $35,000.00 on its face appears to be extremely low.

Another favorable term for the proposed purchaser, Ms. Pisarski, is that her obligation to close under her sale agreement with the Debtor is "contingent upon" her "receiving satisfactory funding of the . . . Purchase Price."[50]

Under the proposed sale to this insider, the purchaser would not assume any of the Debtor's contracts with, or obligations to, any of the Debtor's customers.[51]

Given the Debtor's significant conflict of interest, it is clear that a neutral Chapter 7 trustee should be in control of the liquidation of the Debtor's assets, rather than the Debtor. Conversion to Chapter 7 is in the best interests of the creditors and the estate.

Finally, there a numerous reasons why a conversion and liquidation of the Debtor in this Court, rather than a dismissal of the case, is better for the creditors. A dismissal of this case likely would lead to an inefficient, possibly chaotic, and potentially unfair race by the Debtor's many creditors individually to try to collect their debts from the Debtor, in one or more non-bankruptcy courts. Keeping this Debtor in a single bankruptcy case is likely to be much more efficient for both the Debtor and its many creditors. And a liquidation in bankruptcy will insure the equality of treatment among the Debtor's unsecured creditors that the Bankruptcy Code provides.

In addition, if this case remains in bankruptcy, the Chapter 7 trustee will be able to investigate possible avoidance actions under Chapter 5 of the Bankruptcy Code, and may be able to avoid some of the Debtor's pre-petition transfers for the benefit of the creditors, either as

---

[50] APA at § 3 (Docket # 141 at pdf p. 59).

[51] *See* APA at §§ 15(k), 15(l) (Docket # 141 at pdf p. 67).

preferential transfers under 11 U.S.C. § 547 or as fraudulent transfers under 11 U.S.C. § 548, and/or under the combination of 11 U.S.C. § 544 and Michigan fraudulent transfer law. These avoidance tools are more comprehensive than some similar tools that might be available to individual creditors under Michigan law. It is not yet clear whether or to what extent any of the Debtor's many pre-petition transfers will be avoidable for the benefit of creditors. But the sheer number and value of transfers, and the Debtor's failure to timely disclose many of the transfers,[52] suggests that the transfers should be investigated by a neutral Chapter 7 trustee.

For all of the foregoing reasons, conversion to Chapter 7 clearly is in the best interests of creditors and the estate.

## V.  Conclusion

For the reasons stated in this Opinion, the Court will enter an order granting the Motion, converting this case to Chapter 7, and denying the Debtor's Sale Motion without prejudice. The Order also will cancel the March 27, 2024 adjourned confirmation hearing, as no longer necessary.

Signed on February 12, 2024  /s/ Thomas J. Tucker
                                                      **Thomas J. Tucker**
                                                      **United States Bankruptcy Judge**

---

[52] *See* discussion in Part IV.A.3 of this Opinion.